IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

---

UNITED STATES OF AMERICA, :
:
:
Plaintiff, : Criminal No. 1:19-CR-38
:
vs. :
: TRANSCRIPT OF
TEVONTA REAIR TILLER, : PROCEEDINGS
: (Detention Hearing)
Defendant. :

---

Fourth Floor, Room 455
United States Courthouse
123 East Walnut Street
Des Moines, Iowa 50309
Tuesday, August 13, 2019

BEFORE: THE HONORABLE CELESTE F. BREMER, Magistrate

APPEARANCES:

For the Plaintiff: SHELLY M. SUDMANN
Assistant U.S. Attorney
8 South Sixth Street, Suite 348
Council Bluffs, IA 51501

For the Defendant: NATHAN S. LAB
Attorney at Law
11920 Burt Street, Suite 100
Omaha, NE 68154

Lee Ann Eaton, CSR, RMR, CRR
Eaton.ReportingIA@gmail.com

## I N D E X


| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the Government: John D. Hallock | | | | |
| Ms. Sudmann | 4 | | | |
| Mr. Lab | | 12 | | |
| For the Defendant: Deanna Tiller | | | | |
| Mr. Lab | 15 | | | |
| Ms. Sudmann | | 18 | | |


## E X H I B I T S


| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| Exhibit 1 (Photo) | 10 | 10 |
| Exhibit 2 (Photo) | 10 | 10 |

P R O C E E D I N G S

(The proceedings were commenced by video conference at 1:49 P.M., with the Defendant and Counsel present at the Federal Courthouse in Council Bluffs and Judge Bremer present in Des Moines, Iowa.)

THE COURT: Sorry for the late start, but we have too many things going at the same time. This is case 1:19-38. It's United States versus Tevonta Reair Tiller, and he had an initial appearance last week.

This is the time set for the detention hearing. I believe he has had his arraignment; is that correct?

MS. SUDMANN: Yes, Your Honor.

THE COURT: He appears with counsel. We're doing this by video conference. Does the Government stipulate to using the video conference for the detention hearing?

MS. SUDMANN: Yes, Your Honor.

THE COURT: And is it still your motion for detention?

MS. SUDMANN: Yes, Your Honor.

THE COURT: And does Defendant stipulate to the use of the video conference?

MR. LAB: He does, Your Honor.

THE COURT: All right. And are you prepared to proceed with the detention hearing today?

MR. LAB: Yes, Your Honor.

THE RESPONDENT: All right. So I have looked at the pretrial service report, and does the Government have any additional testimony, proffer, or other information?

MS. SUDMANN: Yes, Your Honor. The Government intends to call one witness, Special Agent John Hallock from the FBI.

THE COURT: All right. And since we're using the video system, let's just have him testify from the conference table there, from counsel table. We'll go ahead and have the clerk place him under oath or affirmation.

JOHN D. HALLOCK,

called as a witness, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. SUDMANN:

Q. Special Agent, please state your name and spell your last name for the record.

A. John D. Hallock, H-A-L-L-O-C-K.

Q. And what is your occupation?

A. I am the Violent Crime Task Force Coordinator for the FBI, Omaha Division.

Q. With your position with the FBI, what are your job responsibilities?

A. Violent crime, to include bank robbery.

Q. I'm going to draw your attention to a bank robbery that

happened in Council Bluffs at Cobalt Credit Union on January 25th, 2019. Was that a bank robbery that you worked?
A. Yes. It was an attempted credit union robbery.
Q. And was the Defendant, Mr. Tiller, charged in that bank robbery?
A. He was, yes.
Q. And what information did you have to charge Mr. Tiller, what physical evidence?
A. After the recovery of the stolen vehicle that was used, there was a bag found in that vehicle, a Marshalls bag, shopping bag. That bag was in turn sent to the FBI laboratory, where Mr. Tiller's latent prints were recovered on that bag. That bag was -- while the vehicle was recovered, we did ask the victim of the vehicle if that bag belonged to them, and it did not.
Q. And did the owner of the vehicle know Mr. Tiller?
A. No.
Q. In your investigation of Mr. Tiller, did you identify that he lived at 1341 West Sixth Street in Papillion, Nebraska?
A. Yes. In fact, the building is 1221 West Sixth, with Apartment Number 2307.
Q. And did you speak with anyone associated with that apartment that Mr. Tiller identified residing at?

A. I did, yes.
Q. And in the pretrial services report it indicates that Mr. Tiller lived alone at that apartment, and based on your investigation, did you get evidence that that is not the case?
A. That is true, yes.
Q. And what evidence did you have regarding that information?
A. When I spoke with the apartment manager initially, when we were looking for Mr. Tiller in reference to his federal arrest warrants, we were able to find out and determine that a Mr. Demetrius Alston was also living at that apartment. That was based on him dropping his identification at the apartment, to include the neighbor identifying him as in and out of Apartment Number 2307.
Q. Did the neighbor also identify that she thought her neighbor was Mr. Alston and not Mr. Tiller?
A. Yes. She identified him as her neighbor.
Q. In addition to speaking with the neighbors, was a search warrant done at this residence?
A. Yes.
Q. And at the search warrant, did you find venue for Mr. Tiller?
A. Yes.
Q. Did you find venue for Mr. Alston?

A. Yes.
Q. And did you find venue for any other people?
A. Yes, for Mr. Tre Boswell.
Q. Now, how long have you worked for the FBI in the Violent Crimes Task Force?
A. I have been with the FBI for 18 years.
Q. And how long have you been specifically in the Omaha area?
A. I have been back approximately seven years.
Q. And does Mr. Alston -- is that a name that you're familiar with?
A. Yes.
Q. And how are you familiar with him?
A. I worked Mr. Alston's -- He was a defendant in a bank robbery that occurred in Bellevue, Nebraska, in 2016, and the FBI and myself worked that case.
Q. And then how about the other person that was -- that's venue was located at that residence?
A. Mr. Boswell has been, through phone records and other various robberies that are still under investigation, Mr. Boswell has come up as associated with these robberies, to include he has now been indicted, as of this morning, in a robbery in Fayetteville, North Carolina, with Mr. Alston as well.
Q. And are you familiar with some of the details that

occurred in Fayetteville, North Carolina?
A. I am, yes.
Q. And when you completed, executed the search warrant, did you find any information in the apartment that would be consistent with the Fayetteville, North Carolina, robbery?
A. Yes.
Q. What information did you find?
A. First, we found the vehicle title of a vehicle that's considered what they call the robbery vehicle, the vehicle that was actually used in the robbery. That title was from Elkin, North Carolina. The Fayetteville Police Department, along with the FBI in Fayetteville, had previously reported to me that that was the vehicle used in the robbery. We found that title.
On top of that we also found clothes that were similar, if not identical, that may have been worn in that robbery, to include hooded sweatshirts and pants and gloves as well and surgical masks that were also found in the apartment.
Q. During that search warrant did you find any items that would be consistent with information that you received from the attempted bank robbery that happened here in Council Bluffs, Iowa, that Mr. Tiller is charged with?
A. Yes. Potentially there were sweatpants that were located in that apartment that may have been worn by one of the defendants.

Q. And were there also gloves that would be consistent with either the Fayetteville robbery or the Council Bluffs attempted robbery?
A. Yes. There were a pair of gray gloves in particular that were cloth in nature with the fingers cut out, and those gloves looked like they matched or at least close to what was worn in the Fayetteville robbery in July 26, 2019.
Q. And in your review of the images or the still images from the Council Bluffs attempted robbery, did it look like, based on your training and experience, that the same type of gloves were worn?
A. Yes.
Q. And can you just describe further for the Court what the gloves looked like and --
A. The gloves will have -- based on my training and experience, the fingers are cut out on the gloves in many of the cases that I have worked, the reason being a lot of times a pair of latex gloves are worn underneath, and that's in order to grab the money.
Most of these robberies that are being investigated involve what we call full-vault bank vault robberies or full takeover-style robberies, and in this case, that particular pair of gloves did have the fingers cut out; and we also found latex gloves at the apartment, which is consistent with what I have seen, based on my training and experience,

that are worn in robberies.
Q. I'm going to show you two photographs, Exhibit 1 and 2. Are those stills, still photos from the attempted robbery here in Council Bluffs, Iowa?
A. That's correct.
Q. And are the things that you have just described, are they captured in Exhibit 1 and in Exhibit 2?
A. Yes.
Q. And is Exhibit 2 believed to be Mr. Tiller?
A. Yes.
Q. And the sweatpants that you have identified at the apartment that he claims to be residing at, those may, in fact, be the sweatpants found in his residence?
A. They may be.
MS. SUDMANN: I would offer Exhibits 1 and 2.
MR. LAB: No objection.
THE COURT: Thank you. For purposes of the detention hearing, Exhibits 1 and 2 are admitted, and I have hard copies of those also.
Q. In regards to -- In addition, Mr. Tiller reported that he was unemployed during the time of his pretrial services interview. Do you have any information from his apartment complex that he identified that he worked somewhere?
A. Yes.
Q. And where was that?

A. Mr. Tiller, while he filled out his application in order to rent that particular premises, he listed a man by the name of Mr. Tyrone Devers, who owns a company called 2 Money 2 Construction (phonetic).
Q. And has Mr. Devers been a person that you are aware of has been indicted federally for crimes?
A. Yes. I was personally involved with Mr. Devers in a large case that was named Operation Red Rising back between 2013 and 2015, in Omaha, Nebraska. Mr. Devers was an indicted defendant in that case.
Q. Is Mr. Tiller associated with any gangs or gang?
A. Yes.
Q. And what gang?
A. He is associated with the Blood gangs, based on the Omaha Police Department's gang file.
Q. Is Mr. Boswell and Mr. Alston also affiliated with the Blood gang?
A. At least associated.
Q. And was a firearm used in this Council Bluffs attempted robbery?
A. Yes.
Q. Based on your investigation of these bank robberies in the Omaha-Council Bluffs and other state area, do you believe Mr. Tiller would be a flight risk?
A. Yes.

Q. And do you believe that based on your investigation of this case and his associates, that he would be a danger to the community?
A. Yes.
MS. SUDMANN: No further questions. Thank you.
THE COURT: Do you have any cross?
MR. LAB: I do, Judge. Thank you.

CROSS-EXAMINATION

BY MR. LAB:
Q. Officer Hallock, in reference to Exhibit 2, you indicated previously you believe that was the Defendant, Mr. Tiller; is that fair?
A. Yes.
Q. Is that based on any witness identification of any sort, or has anybody identified that individual as Mr. Tiller?
A. No.
Q. Has there been any identification from anyone during your extensive investigation of this while identifying Mr. Tiller as one of the two participants there either in Exhibit 1 or Exhibit 2?
A. No.
Q. Outside of the fingerprints you mentioned on this bag, is there any other forensic evidence, DNA or otherwise, that would link Mr. Tiller to this crime on January 25th?

A. Not as of yet, no.
Q. So although you performed a search warrant or officers performed a search warrant at an apartment where you believe Mr. Tiller was residing, there has been no further evidence as a result of that warrant that would support implication of Mr. Tiller in this crime?
A. Other than potentially those sweatpants being worn, if that's them.
Q. At this residence you do agree there are two other individuals who at least have a prior dealing with or have been under investigation for robberies?
A. That's correct, yes.
Q. Have you done any research as far as any forensic evidence regarding any cell phone or electronic communications in this case?
A. That's underway as we speak.
Q. And have there been any results in that that implicate Mr. Tiller at this time?
A. Not as of yet.
Q. Has anybody else been arrested or indicted in particular to this robbery?
A. No.
Q. So when you referenced the other individuals, Mr. Alston, Mr. Boswell and Tyrone Devers, they have all been sources of investigation, but that has been in separate

robberies?
A. Correct, and currently speaking, Mr. Alston and Mr. Boswell have warrants out of the -- based on the Fayetteville, North Carolina, robbery.
Q. And is there anything connecting Mr. Tiller to the Fayetteville robbery?
A. No.
MR. LAB: That's all I've got, Your Honor.
THE COURT: All right. Any follow-up?
MS. SUDMANN: No, Your Honor.
THE COURT: All right. Thank you. So we can go ahead and excuse the witness?
MS. SUDMANN: Thank you, Your Honor. Yes.
THE COURT: Thank you. Anything else from the Government?
MS. SUDMANN: No, Your Honor.
THE COURT: And for Defendant, did you have any proffer or testimony?
MR. LAB: Judge, I would like to briefly call to testify Deanna Tiller.
THE COURT: All right. And that's defendant's mother?
MR. LAB: It is.
THE COURT: All right. If she is able to, could she use the podium, and if not, then we'll get her a chair

somewhere, okay?

COURT CLERK: Please raise your right hand.

DEANNA M. TILLER,

called as a witness, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. LAB:

Q. Thank you, Ms. Tiller. Could you please state your name and spell it for the Court.

A. Deanna McKnight Tiller, D-E-A-N-N-A M-c-K-N-I-G-H-T T-I-L-L-E-R.

Q. And are you related to the Defendant, Tevonta Tiller?

A. Yes.

Q. How so?

A. I'm his mother.

Q. Has he resided with you in the past?

A. Yes.

Q. Where do you currently reside?

A. I live at 2122 Franklin Street, Omaha, Nebraska, for 18 years.

Q. At any point has Mr. Tiller resided with you at that residence?

A. He has been there for 18 years.

Q. And if he was released, would you be willing to allow him to reside at that residence with you?

A. Yes, I will.
Q. Is there anybody else that resides at that residence currently?
A. No.
Q. Is there an available bedroom or space for him to stay if he was to reside in that residence?
A. Yes. There's plenty of space there.
Q. Have you ever been convicted of a felony?
A. No. I don't know what that is, either.
Q. Do you recall having any contact with a probation or pretrial officer within the last couple of days regarding the questions I have asked you?
A. Yes.
Q. And did you notify that individual that you would agree to allow Mr. Tiller to reside at your residence?
A. Yes, I have.
Q. And are you aware that if he was released, there would be certain conditions he would have to follow set by this Court?
A. Yes, I'm aware.
Q. And would you agree that if you were to find out he was violating those conditions in any way or engaging in any type of illegal or criminal activity, that you would notify the proper authorities immediately?
A. Yes, I will. I have in the previous, when Tevonta was

14 years old, called the law enforcement on him and tagged him as hanging out with known gang members. So that is how he has been tagged as a gang member, because he was 14 years old, and I called the cops and his records should show that in Omaha, Nebraska, and I got him sent to Boys Town so he wouldn't be hanging out with the wrong crowd.

So I'm the one, as his mother, that called the cops several times and reported that he was hanging out with gang members, and I also worked with a Joy Bowler (phonetic) down at district court; and she helped me out and got Tevonta a status one, and I don't know exactly what that is, but that's what she told me. And that's how Tevonta ended up in Boys Town for missing curfew and stuff like that, but I am willing to go 100 percent and beyond to help the authorities keep Tevonta tracked at my house if he's released today.

Q. Ms. Tiller, I understand as a mother this is a difficult situation, but it appears that you would be very willing that if Tevonta were to be released but he were not to be compliant with this Court's conditions or orders, you would immediately take action to notify the authorities?

A. I will notify the authority immediately. I have done it before.

Q. Thank you, Ms. Tiller. That's all of the questions I have.

THE COURT: Do you have cross-examination?

MS. SUDMANN: Just a few questions, Your Honor.

CROSS-EXAMINATION

BY MS. SUDMANN:

Q. Ma'am, does your daughter live with you?

A. No, she doesn't. She lives in Miller.

Q. Is your sister named Dawn McKnight?

A. Yes, she is.

Q. And does she have a son named Delonta McKnight?

A. Yes, she does.

Q. And isn't it true that Mister -- that he was charged in a robbery case recently?

A. I don't know. I don't know anything about Delonta McKnight.

Q. Well, he's your son's first cousin; is that fair?

A. That is correct, but you have family members that you just don't deal with all the time, their kids, but I do talk to my little sister; but she does not discuss anything with me. I read articles, and that's about it. I don't know nothing about my nephew.

Q. And he lives in the Omaha area; is that correct?

A. Delonta?

Q. Yes.

A. I don't know, ma'am.

Q. And so it's fair to say that your son has been in trouble in the past and you have had to send him to Boys

Town; is that correct?
A. Correct, to prevent trouble, not that he has been trouble, to prevent trouble.
Q. And you have contacted the police because he was associated with gang members; is that correct?
A. Correct, that I thought that was gang members. I'm not a gang person to know gang members, but I know older kids shouldn't be hanging out with a 14-year-old.
Q. And those things happened when he lived with you; is that correct?
A. Yes, me and his dad, but his dad is deceased now.
MS. SUDMANN: Yes, I understand that. No further questions. Thank you.
THE COURT: Can I just ask a couple of questions, Ms. Tiller? Can you tell me how old you are, please.
THE WITNESS: I am 49 years old.
THE COURT: All right. Thank you. Are you employed?
THE WITNESS: Yes, I am, ma'am.
THE COURT: Okay. So tell me where you work.
THE WITNESS: I work for OPS school. I work there as a registered medical assistant. I have been there for four years. I left the hospital after my husband passed away at the University of Nebraska Medical Center, where -- I worked there for years. I have been in the health care

field for many years.

THE COURT: So at this school -- would that be like the Omaha Public Schools; is that what the OPS means?

THE WITNESS: Oh, I'm sorry. Yes, Your Honor.

THE COURT: Okay. And so is that a full-time job?

THE WITNESS: Yes, it is.

THE COURT: Okay. And like daytime hours; is that typical?

THE WITNESS: 7:00 to -- sorry. 7:00 to 3:30 Monday through Friday. I took a half a day to be here.

THE COURT: All right. And we appreciate it. I know it's hard, and I know it's a hard position to be in; and it sounds like you have tried to be as proactive as you can be, and, you know, at some point, you know, you have to be able to make some rules and hope people follow them. So I do appreciate your interest, and one of the things that I look at is family support and what contacts a person has with a community, and so I appreciate hearing from you directly that he does have community contacts.

Counsel, do you have any other questions for Ms. Tiller?

MR. LAB: No, Your Honor. Thank you.

THE COURT: All right. Thank you. So you can go ahead and have a seat.

THE WITNESS: Thank you.

THE COURT: And for Defendant, do you have any other testimony or proffer?

MR. LAB: Judge, there may be a few things I want to add that aren't in the pretrial report at least in regards to Mr. Tiller's prior employment history.

THE COURT: Okay. Go ahead. You can do that by proffer.

MR. LAB: Thank you, Judge. I do want to note for the Court that while it indicates in the pretrial services report that Mr. Tiller did receive a welding certificate in 2017, that although he hasn't been employed in the past six months, it does indicate -- or I am aware based on the Nebraska Department of Labor that in 2017 and 2018, Mr. Tiller was employed by several companies, most of that in his capacity with -- well, as a welder. Those were Advanced Services, Omaha Steel Castings, Aparium Hospitality Services and Plum Rose USA. So there are at least four confirmed employers he has had over the past two years that do not appear in the pretrial services report.

THE COURT: All right. Thank you. And anything else by way of proffer or testimony?

MR. LAB: No, Your Honor.

THE COURT: And no other testimony?

MR. LAB: No, Your Honor.

THE COURT: All right. Thank you. I'll let the

Government argue, because it's their motion.

MS. SUDMANN: Thank you, Your Honor. The Government submits to the Court that Mr. Tiller should be detained based on the danger to the community as well as the presumption as well as a flight risk, a potential flight risk.

Mr. Tiller's employment that he actually did report to his rental property where he had an apartment, he included that Tyrone Devers was his company -- was his employer, who is a known indicted criminal. His two roommates are the people that had venue at the apartment and were seen at the apartment where Mr. Tiller resided are, again, two people that are people indicted or have arrest warrants for robbery charges, ironically enough, the same kind of charge that Mr. Tiller is charged with right now.

In addition to that, a firearm was used in this attempted robbery at the credit union, which is a danger to the community, a potential danger to the society. In looking at his criminal history, he was convicted of carrying a concealed weapon at 18 years -- when he was 18 years old.

That coupled with the fact that the opportunities where Mr. Tiller could live, if not this apartment, which is probably not available anymore, would be living with his mom. Although she does appear to be a proactive mother,

despite these efforts -- she called the police on him for hanging out with gang members, she reached out to other personnel to which Mr. Tiller then went to Boys Town as a teenager and even now as an adult continues to commit crimes despite being at Boys Town, despite having a proactive mom; and for those reasons the Government would ask the Court to follow the recommendation of pretrial services and that Mr. Tiller be detained.

THE COURT: All right. Thank you. And argument for Defendant?

MR. LAB: Thank you, Your Honor. I do believe that there are a number of conditions which would secure the appearance of Mr. Tiller back in court as well as quell any concern of him being a danger to himself or society. He is a young individual. He is 22 years old. So while he doesn't have a lengthy employment history, I think that's not unusual for somebody at this young age. He spent a lot of that working toward higher education, including a welder certificate he received in 2017 and was, in fact, able to use that productively with some job opportunities.

The concern seems like it is most noted from the Government is the idea that he has this proximity or association to these other individuals that are implicated in other robberies. I do want to note for the Court, while I'm not here to argue necessarily the -- We're not here to

argue or litigate the guilt or innocence of Mr. Tiller, but I do believe it is interesting that the Government's evidence at this point is a couple of fingerprints on a bag. They have a call to go out to a robbery at the Cobalt Credit Union.

There are two individuals that they see. They find a bag that they believe has prints that may match Mr. Tiller's and when they go to effectuate a search warrant, they find two individuals who are implicated in other robberies. So it's not a far stretch to say if Mr. Tiller was in proximity to these individuals or associated with it, it would make sense that if they grabbed a bag, it may have his prints on it, but there's nothing to identify -- no one has implicated, identified, there is no corroborating evidence to suggest that either one of the individuals that are depicted in Exhibit 1 or 2 are Mr. Tiller. So the weight of the evidence is something I do want to ask this Court to consider.

It's not often I ask that when I am in federal court. Federal courts typically have some weighty evidence in their cases, but there is one of exceptions where I think it's not as strong as I usually see when I'm in court.

Beyond that, Judge, in looking at -- I think the bigger argument, my concern is the nature of the offense seems to be superseding all of the other concerns in this

case. Because it was an attempted robbery, although the two individuals who attempted to rob the facility never made it inside, that if we excise that portion, everything else seems to indicate that Mr. Tiller would be someone who I do think would be appropriate for release.

I do believe with GPS monitoring -- although I don't necessarily think that would be necessary, I certainly wouldn't be opposed to it. He has spent his life in the community. He has got strong ties; his mother, that you heard from. There is also his sister in court, which may be difficult to see her on video, but she is here in support. He has a strong support unit, strong family ties. He has been in the area virtually his entire life, and he would be residing back in a residence that he has resided for most of his life. I know it may be somewhat concerning to hear his mother previously had to make a tough decision and contact -- I don't know if that was law enforcement or just local authorities that believed that perhaps Boys Town was a good placement for him, but I think many parents would take that reasonable step.

Boys Town is a place where they try and keep people away from bad influences. So I don't necessarily see that as a negative. I see that as a mother being proactive, to take steps to say, "If I can't be there 24/7 to watch over you -- there's school, there's work -- I'm going to

make sure you're in a place where that doesn't happen." So I think that it should more cut against the Government that we have an individual here who would act as a third-party custodian, that although difficult, clearly has no qualms about notifying court, probation or law enforcement if Mr. Tiller is not abiding by all conditions that this Court would set forth.

Beyond that, I know his criminal history, there's not much there. There is quite a few things over the past few years. The only thing that I think gave any concern, I know there was a carry and conceal back when he was 18 years old. He did have a 30-day sentence for that, but beyond that, it is basically traffic tickets. There are a couple of failures to appear, I note, in Nemaha County back in 2016 or 2017. I'm not going to try to make any excuse for that. I do believe there is some context to understand that those failures to appear for were decriminalized statutes -- in other words, no jail. He typically just shunned his obligation because I don't think he necessarily understood the severity of the situation because it was just going to be fines regardless.

That is not the case here. He is well aware of the situation he is in, the risk he would be putting himself in if he were to fail to show up or if he were to fail to appear in court. I know his failure to appear are a bit

concerning, but I think in context, given the severity of the charges in which he failed to appear for back in 2017 when he was 19 years old, I don't think those should be held against him to an extent that would indicate he would be a risk of nonappearance to the court.

I think the only other real concern then is his lack of verified employment. I don't know why there is employment listed. That may have been listed simply to appease a leaseholder, to be able to rent or lease an apartment, but I do know there is at least a track record there to support that, with a welding certificate. He has been gainfully employed in the past. I do think he can regain that ability, and I'm certain, after conferring with his family, they will do everything they can to help with that, and he certainly has strong family ties that will help him gain employment in any way, shape or form.

He doesn't appear to have any type of substance abuse history. He may have admitted, I think, to perhaps ingesting maybe marijuana once or twice or alcohol, but there's nothing here to suggest he has a substance abuse problem or a history, so that should not be a concern for the Court or for pretrial.

I notice there is an assessment of danger that says pattern of similar criminal activity history. I don't quite understand where that is necessarily coming from. I

do know he has a carry and conceal from 2015, but beyond that, again, it seems to be speeding ticket, a simple possession of marijuana back in 2015, again another one, it looks, again in 2015, but nothing that would indicate a violent streak that would be, I think, as concerning to this Court as opposed to the infractions he actually has on his record.

So in looking at the factors under 3142, again I think if we excise or at least table the nature of the offense at this point, all other conditions seem to lay in his favor, including physical and mental conditions. He is in good physical health. His mental condition seems to be well. There doesn't appear to be any type of substance abuse history. He has got strong ties. He does have the ability for gainful employment. He does have a welding certificate. He appears -- While not maybe having the greatest of financial resources, I think his family has certainly shown they would be willing to help him out with that and provide him a residence. His ties to the community, and, again, there's no past conduct relating to drug or alcohol abuse, so I think a lot of those factors certainly favor in regards to Mr. Tiller.

So for those reasons I would ask this Court to consider release on conditions that he be kept in the district here or in Omaha to live with his mother and his

family, that he be placed on GPS monitoring. I believe that should quell all of the concerns of the Government in regards to nonappearance or concerns over some sort of association with other jurisdictions. I heard Fayetteville, North Carolina, but it doesn't appear there was any type of association there, but again I would ask this Court to consider that. A GPS monitor I believe would certainly be effective in quelling all those concerns from the Government.

If an evaluation is necessary, I know Mr. Tiller would be more than happy to do that. He would be more than amenable to gain productive employment and stay in the community. So with all that, I would ask this Court to consider release upon those conditions.

THE COURT: All right. Thank you. Based on the information that I have, by the proffers, testimony, pretrial services report and arguments of counsel, I'm going to order that the Defendant be detained at this time. I find that there are no conditions of release available that reasonably assure the safety of the community. I do not find risk of flight, so I'm not trying to manage risk of flight.

I appreciate Defendant's mother offering her residence and her availability to supervise him when she's not at work. I think how Defendant presents here, even with

the misdemeanor record and adjusting for failures to appear that seem to have been in a cluster in February of 2016, and then eventually that case gets resolved later in '17, so, I mean, that's notable but not the biggest issue for me.

He does have three misdemeanors that involve substance, marijuana, illegal substances, plus the carrying of a concealed weapon, which appears to have been a loaded gun, and, again, that's three or four years ago; so I'm trying to figure out if he's aging out of some of this behavior because --

UNIDENTIFIED SPEAKER: May I say something?

THE COURT: Not right this minute, but in a minute you can talk to his lawyer. I need to -- I need to finish what I'm saying, and then in a minute you can talk to his lawyer; and we'll give you a chance to make a further record.

And so considering what I think is the unstable living circumstance for 2019, for sure, I don't have confidence that his mother is adequate to supervise him at this stage of his life. I would consider residence in a halfway house if there's a suitable one that would ensure that he is getting some substance abuse evaluation and treatment, if necessary, would ensure that he's getting employment, which are two big issues that I see here in terms of his ability to be managed on conditions of release,

and it would resolve the living in the community, because he would be living in a more supervised community.

I don't know what our availability is for bed space in Council Bluffs these days but probation will work with you to check on it because I know there's places in Omaha in addition to Council Bluffs.

So if you want to explore that and then file a motion to reconsider, you're certainly welcome to do that. Otherwise you could appeal this. You would have to do it within 14 days. There's no automatic stay on appeal, so you would have to get on a district judge's calendar to consider whether they would view that there are appropriate conditions of release.

So I'll get you order as soon as I can. If you want to take a moment -- I wasn't sure who was trying to talk to you or to me, but if you want to take a minute and go talk to them, I'm happy to let you do that, counsel.

MR. LAB: Thank you, Judge. It was a family member. If you could just grant me a few moments just to make sure that their concerns are addressed.

THE COURT: Sure.

(A brief recess was taken.)

MR. LAB: Thank you, Judge. I appreciate the opportunity to speak with Mr. Tiller's family. As I'm sure the Court is aware, these can be difficult hearings for

family.

I have nothing further to add or address with the Court, though.

THE COURT: Thank you. If there are new material facts that come available to you or we can get him evaluated for placement, just file a motion to reconsider, and we'll get a chance to do that. All right?

MR. LAB: Thank you, Your Honor.

THE COURT: All right. Anything else we need to do?

MS. SUDMANN: No, Your Honor.

THE COURT: All right. Thank you.

(The proceedings were concluded at 2:29 p.m.)

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Court Reporter for the State of Iowa, do hereby certify that I was present during the foregoing proceedings and took down in shorthand the testimony and other proceedings held; that said shorthand notes were transcribed by me by way of computer-aided transcription; and that the foregoing pages of transcript are a full and correct transcript of the shorthand notes so taken.

Dated this 6th day of July 2020.

*/s/ Lee Ann Eaton*
Lee Ann Eaton, CSR, RMR, CRR
Certified Court Reporter

Transcript ordered: June 23, 2020

Transcript delivered: July 6, 2020